# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 3161 | **DATE** | 7/28/2004 |
| **CASE TITLE** | Washington vs. DeYoung, et. al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached memorandum opinion and order, defendants' motion for summary judgment is granted in part and denied in part. The motion for summary judgment is granted as to plaintiff's claims against Bohney as an individual and as to Walgreen for plaintiff's claim for punitive damages. The motion for summary judgment is denied as to all other claims. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | Document Number |
| | Notices mailed by judge's staff. | | JUL 29 2004 | | |
| | Notified counsel by telephone. | | date docketed | | 32 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | | |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | | | |
| MF | courtroom deputy's initials | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
JUL 2 9 2004

ANTRON WASHINGTON, as parent and next )
friend of TIFFANY WASHINGTON, )
)
Plaintiff, )
)
v. ) No. 03 C 3161
)
JEFF DEYOUNG, PAUL BOHNEY, and ) Judge John W. Darrah
WALGREEN CO., )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Antron Washington ("Washington"), as parent and next friend of Tiffany Washington ("Plaintiff"), filed suit against Defendants, alleging racial discrimination in violation of 42 U.S.C. §§ 1981 and 1982. Presently before the Court is Defendants' Motion for Summary Judgment.

### BACKGROUND

Paul Bohney is a Caucasian male who was the manager of the Walgreen's Park Forest, Illinois store. Bohney has been employed as a manager at Walgreen for fifteen years and has been assigned to several stores, including the Park Forest store. (Def.'s 56.1(a)(3) Statement ¶ 4). Jeff DeYoung is a Caucasian male who was an assistant manager at Walgreen's Park Forest store. DeYoung has been an assistant manager for Walgreen for seventeen years. (Id., ¶ 5).

Tiffany Gray[1] is an African-American female teenager who attended eighth grade at

---

[1] Tiffany Gray is incorrectly identified in the caption of the Complaint as Tiffany Washington. Antron Washington is Gray's stepfather.

32

Forest Trail Middle School during the 2001-2002 school year. (Def.'s 56.1(a)(3) Statement ¶ 8). Jameca Lipscomb and Alicia Shivers are also two African-American female teenagers who attended eighth grade at Forest Trail Middle School during the 2001-2002 school year. (Id., ¶ 9).

Walgreen prohibits discrimination against employees, customers, vendors, and all other persons with respect to employment decisions, the making and enforcing of contracts, its sales practices, and its loss prevention and security practices. (Def.'s 56.1(a)(3) Statement ¶ 14). Walgreen's orientation guide states that all customers are to be served fully and fairly. It is Walgreen's pledge to treat all people "without regard to race, national origin, religion, sex, age...." (Plaint.'s 56.1(b)(3) Statement ¶ 53).

Walgreen trains its employees, supervisors, and managers that the company prohibits discrimination as described above. (Def.'s 56.1(a)(3) Statement ¶ 15). Bohney has attended periodic management meetings during which Walgreen has trained him on subjects including, but not limited to, the prevention of discrimination and harassment. (Id., ¶ 16). DeYoung has attended annual assistant manager meetings during which Walgreen has trained him on subjects including, but not limited to, the prevention of discrimination and harassment. (Id., ¶ 17). Bohney and DeYoung have received and reviewed copies of Walgreen's policies against discrimination. Bohney and DeYoung periodically review these policies, which are posted in the Walgreen's Park Forest store. (Id., ¶ 18).

The Park Forest Walgreen store is located in a racially mixed community. At least half of the store's customers are African-American. (Def.'s 56.1(a)(3) Statement ¶ 19). During the 2001-2002 school year, the Park Forest store employed both African-American and Caucasian employees. (Id., ¶ 20). African-American customers of the Park Forest store are permitted to

enter all of the same areas of the store that non-African-American customers are permitted to enter. (Id., ¶ 21). Walgreen's employees increase monitoring of customers in the Park Forest store whenever business or security reasons require them to do so. For example, when large numbers of customers are in the store or when employees suspect persons of shoplifting. (Id., ¶ 22).

During the 2001-2002 school year, African-American and Caucasian customers, including middle school students, were often in the Walgreen store after school and purchased merchandise from the store. (Def.'s 56.1(a)(3) Statement ¶ 23). Virtually every weekday afternoon during the 2001-2002 school year, large groups of African-American and Caucasian middle school students went into the Park Forest Walgreen after school. (Id., ¶ 24). Walgreen's employees increased their monitoring of the store when the groups of middle school students came into the store because of problems the store was having with these students. (Id., ¶ 25). The students were often disruptive, rowdy, profane, and rude to staff and other customers. (Id., ¶ 26). The students often blocked the entrance and exits to the store, blocked aisle traffic, and engaged in fighting and play-fighting in the store and outside the store. (Id., ¶¶ 27-28). Some middle school students were caught or suspected of stealing and damaging the store's products. (Id., ¶ 30). The police were called on several occasions to handle problems with middle school students inside and outside the store. (Id., ¶ 32). If children were rowdy, Bohney would ask them to "calm down and conduct themselves like they were in a business." If they did not calm down, Bohney would ask the children to leave the store. (Plaint.'s 56.1(b)(3) Statement ¶ 5).

Virtually every weekday between September 2001 and May 9, 2002, Plaintiff and two of her middle school friends went into and purchased items from the Park Forest Walgreen store

3

after being dismissed from school. (Def.'s 56.1(a)(3) Statement ¶ 33). Other than one occasion, when DeYoung asked Plaintiff and her friends to leave the store, Plaintiff had not been asked to leave the store, nor has she seen any Park Forest Walgreen employees ask any other customers to leave the store. (Id., ¶ 34). While in the store, Plaintiff believed that DeYoung followed her or watched her too closely. Plaintiff also alleges that when she and her friends went into the store, she heard a "code" called out over the store's announcement system. DeYoung's conduct nor the announcement of the code did not stop Plaintiff from going into or purchasing items at the store. (Id., ¶¶ 35, 37). Plaintiff never observed Caucasian customers being watched or followed by Walgreen's management. (Plaint.'s 56.1(b)(3) Statement ¶¶ 20-21, 23). However, Plaintiff did observe other African-American customers being watched and followed by management. (Id., ¶ 22).

Prior to May 10, 2002, DeYoung saw Plaintiff in the Walgreen store and believed that she and her friends were being disruptive and using foul language. (Def.'s 56.1(a)(3) Statement ¶ 39). DeYoung had also previously asked Plaintiff and her friends not to stand in the magazine aisle and read the magazines without purchasing the magazines. (Id., ¶ 40). On one occasion when DeYoung asked Plaintiff and her friends not to read the magazines, Plaintiff believed that DeYoung had an "attitude." Plaintiff also had an "attitude" when she responded to DeYoung. (Id., ¶ 41). Plaintiff denies ever using profanity while in the Walgreen. (Plaint.'s 56.1(b)(3) Statement ¶ 11).

On one occasion, prior to May 10, 2002, DeYoung "locked" the automatic door to the Walgreen store, stood in the door, and told Plaintiff that she would have to show him her money if she wanted to enter the store. Plaintiff did not ask why DeYoung requested to see her money

4

and did not show him any money. (Def.'s 56.1(a)(3) Statement ¶ 36). Prior to this date, DeYoung had not asked Plaintiff to leave the store nor had DeYoung made any comments to Plaintiff or her friends about her race. (Id., ¶ 38).

Plaintiff and her friends went to the Walgreen store on May 10, 2002. Plaintiff went to the aisle that stocks potato chips. (Def.'s 561.(a)(3) Statement ¶ 42). Plaintiff did not know what her friends were doing while she was in the aisle that stocks potato chips. (Id., ¶ 43). As Plaintiff returned to her friends, DeYoung asked Plaintiff and her friends to leave the store because he believed that they had been in the store for a significant period of time without making a purchase and that one or more of them were being disruptive and profane. (Id., ¶¶ 44-45). Plaintiff believes that DeYoung had an "attitude" when he told them to leave the store, telling them to "get out." (Id., ¶ 46). Plaintiff did not ask DeYoung why he was asking her and her friends to leave the store. (Id., ¶ 47). Plaintiff did not purchase the bag of potato chips that were in her hand and left the store. (Id., ¶ 48). When Plaintiff and her friends left the store, other African-American and Caucasian customers were in the store. (Id., ¶ 49). Bohney did not see DeYoung ask Plaintiff and her friends to leave the store. (Id., ¶ 50). DeYoung did not bar Plaintiff or her friends from returning to the store. (Id., ¶ 51).

After leaving the store on May 10, 2002, Plaintiff went home and told her mother and stepfather that Walgreen's assistant manager had asked her and her friends to leave the store. (Def.'s 56.1(a)(3) Statement ¶ 52). Less than thirty minutes after she had been asked to leave the store, Plaintiff returned to the store with her family and two friends. (Id., ¶ 53). Plaintiff's stepfather, Washington, approached DeYoung and asked him why Plaintiff had been asked to leave the store. DeYoung did not give Washington a specific answer but informed him about the

5

problems the store was having with middle school students. (Id., ¶ 55). Washington also asked Bohney why Plaintiff was asked to leave the store. Bohney told Washington that he did not know why Plaintiff had been asked to leave the store. (Id., ¶ 56). Plaintiff and her family then left the store. (Id., ¶ 57).

After Plaintiff and her family left the store, Bohney questioned DeYoung regarding Washington's complaint. DeYoung explained that he had asked Plaintiff and her friends to leave the store because of their conduct and that he had previously had problems with Plaintiff and her friends. (Def.'s 56.1(a)(3) Statement ¶ 59).

A few days after May 10, 2002, Washington sent a letter to one of Walgreen's then-district managers, Cheryl Gidcumb, complaining about DeYoung's treatment of Plaintiff. (Def.'s 56.1(a)(3) Statement ¶ 60). Shortly after he sent the letter, Gidcumb telephoned Washington and advised him that she would investigate his complaint. (Id., ¶ 62). Gidcumb did not again contact Washington, and Washington did not contact her. (Id., ¶ 63).

On at least one occasion, Bohney questioned DeYoung, at the direction of Gidcumb, about whether he had locked the store's doors when Plaintiff came to the store and whether he had required her to show him money before entering the store. DeYoung denied the allegations. (Def.'s 56.1(a)(3) Statement ¶ 64).

When Plaintiff was in the Walgreen store, she did not pay much attention to who else was in the store and/or whether those other persons were buying anything. (Def.'s 56.1(a)(3) Statement ¶ 67). Plaintiff believes that a Caucasian boy who was in the store on May 10, 2002, was treated better than she was treated. Plaintiff does not know the Caucasian boy's name nor how often he came into the store, how he conducted himself in the store, and whether he

typically came into the store alone or with other students. (Id., ¶¶ 69-70). Plaintiff observed the boy in the store both when she first entered the store and later, when she returned with her parents. (Plaint.'s 56.1(b)(3) Statement ¶¶ 29, 33).

DeYoung and Bohney testified that they have asked non-African-American persons to leave the Walgreen store. (Def.'s 56.1(a)(3) Statement ¶ 77).

Prior to May 10, 2002, Plaintiff's parents had shopped at the Walgreen store. Washington often visited the store with Plaintiff and never saw Plaintiff or any other students being asked to show their money before they were allowed to enter the store. (Def.'s 56.1(a)(3) Statement ¶¶ 78-79). Neither of Plaintiff's parents have been asked to leave while shopping at the Walgreen store and have not ever heard a "code" called out when they were in the store. (Id., ¶¶ 83-84).

John Terry is an African-American male who lives approximately one block from the Park Forest Walgreen store. (Def.'s 56.1(a)(3) Statement ¶ 12). Maggie Scioani is a Caucasian female who lives approximately one block from the Park Forest Walgreen store. Scioani shops at the Park Forest Walgreen store approximately two or three times a week. (Id., ¶ 13). Scioani and Terry never saw Walgreen employees ask customers to show their money before being allowed to enter the store. (Id., ¶ 80).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (*Celotex*). All the evidence and the reasonable inferences that may be drawn from the

evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001) (*Greer*).

A party opposing a motion for summary judgment must file a concise response to the movant's statements of material fact, including a response to each numbered statement. In the case of any disagreement, the opposing party must site specific references to the affidavits, parts of the record, and other supporting materials relied upon by the opposing party. The opposing party may also include statements of additional material facts that rebut the moving party's motion. These additional facts must also include references to affidavits, parts of the record, and other supporting materials that support such additional material facts. L.R. 56.1(b)(3).

Section 1981 prohibits discrimination in the making and enforcement of contracts. 42 U.SC. § 1981(a). Under Section 1981, "making or enforcing" a contract includes the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Similarly, Section 1982 prohibits discrimination in the purchase of personal property. 42 U.S.C. § 1982. Claims brought pursuant to Section 1981 and 1982 are generally construed in tandem. *See Morris v. Office Max*, 89 F.3d 411, 413 (7th Cir. 1996) (*Morris*).

To establish a claim under Section 1981, a plaintiff must show that: (1) she is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and

(3) the discrimination deprived the plaintiff of one or more of the rights enumerated in Section 1981, *i.e.*, the making and enforcement of a contract. *See Morris*, 89 F.3d at 413. Likewise, to establish a cause of action under Section 1982, a plaintiff must show that: (1) she is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination deprived the plaintiff of one or more of the rights enumerated in Section 1982, *i.e.*, the purchase of personal property. *See Morris*, 89 F.3d at 415.

To avoid summary judgment on her race discrimination claim, the Plaintiff must present facts from which a reasonable juror could find that the Defendants interfered with her contractual rights because of her race. *See Steinhauer v. Degolier*, 359 F.3d 481, 483 (7th Cir. 2004) (*Steinhauer*). A *prima facie* case under Sections 1981 and 1982 include evidence that (1) the plaintiff is a member of a racial minority, (2) the defendant had an intent to discriminate on the basis of race, and (3) the discrimination concerned one or more of the activities enumerated in the statute. *See Morris*, 89 F.3d at 413 (7th Cir. 1996). There are two methods of proof available to a plaintiff – the indirect method and the direct method. *See Steinhauer*, 359 F.3d at 484.

Under the *McDonnell Douglas* indirect method, the plaintiff must establish a *prima facie* case of discrimination as set forth above. The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. The defendant is entitled to summary judgment at this point unless the plaintiff can present sufficient evidence that the defendant's proffered reason for its actions is a pretext for discrimination. *See Steinhauer*, 359 F.3d at 484.

9

For summary judgment purposes, the plaintiff must only produce evidence from which a rational factfinder could infer that the defendant lied about its proffered reasons for its actions. *See Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124 (7th Cir. 1994).

The parties do not dispute that the Plaintiff is a member of a racial minority. Defendants argue that the Plaintiff has failed to present evidence that the Defendants intended to discriminate against her because of her race. Defendants identify several undisputed facts which demonstrate that Plaintiff was allowed to purchase items at the store and that other African-Americans were also allowed into the store and allowed to purchase items prior to and after May 10, 2002. However, Plaintiff also testified in her deposition that only African-Americans were followed and watched while in the store and that when she entered the store, a "code" was broadcast over the intercom system; this same code was not broadcast when Caucasians entered the store. DeYoung and Plaintiff also have differing renditions of what occurred prior to DeYoung's asking the Plaintiff and her friends to leave the store as to whether Plaintiff and/or her friends were engaged in any conduct calling for DeYoung's ordering Plaintiff and her friends from the store. Furthermore, on May 10, 2002, a Caucasian juvenile was in the store for an extended period of time but was not asked to leave the store. Based on the above, genuine issues of material fact exist as to whether DeYoung's actions were racially motivated.

Defendants also argue that the Plaintiff has failed to present evidence that she was denied the right to make a contract – to purchase the potato chips – because she never expressed her desire to purchase the chips before she left the store. However, when DeYoung told the Plaintiff and her friends to exit the store, Plaintiff had a bag of potato chips in her possession. After DeYoung ordered Plaintiff and her friends to leave the store, Plaintiff did not purchase the potato

chips. These facts demonstrate a genuine issue of material fact exists as to whether DeYoung's conduct prevented Plaintiff from purchasing the potato chips. While DeYoung did not explicitly state that Plaintiff could not purchase the chips, he did order her to exit the store before she had the opportunity to purchase the chips that were in her possession.

Furthermore, Plaintiff has produced sufficient evidence from which a rational factfinder could infer that DeYoung's proffered reason for asking Plaintiff and her friends to exit the store was a pretext to discrimination. This evidence includes the disputed conduct of the Plaintiff and her friends prior to being ordered to leave the store and the disputed evidence of DeYoung's conduct toward Plaintiff prior to May 10, 2002.

Bohney argues that he cannot be held liable because he was not personally involved in the alleged discrimination. Plaintiff argues that as the store manager, Bohney, knew, or should have known, about DeYoung's discriminatory conduct.

"Individual liability under Section 1981 can be found only where the individual himself has participated in the alleged discrimination against the plaintiff." *Behnia v. Shapiro*, 961 F. Supp. 1234, 1237 (N.D. Ill. 1997) (*Behnia*). In the instant case, Plaintiff has presented no evidence that Bohney was personally involved in any of the alleged discriminatory conduct. Furthermore, individual liability cannot be based on any alleged knowledge of discriminatory conduct by Bohney. *See Behnia*, 961 F. Supp. at 1237 (knowledge alone does not equate to actual participation); *Daulo v. Commonwealth Edison*, 892 F. Supp. 1088, 1092 (N.D. Ill. 1995) (knowledge by defendant of alleged discriminatory conduct insufficient to impose individual liability without any individual participation in discriminatory conduct). Accordingly, Defendants' Motion for Summary Judgment as to Bohney as an individual defendant is granted.

Lastly, Walgreen argues that Plaintiff has failed to present evidence in support of her claim for punitive damages.

"[I]n the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good faith efforts to comply with Title VII." *Kolstad v. American Dental Assoc.*, 527 U.S. 526, 545 (1999) (internal quotations omitted) (*Kolstad*). Good faith efforts by an employer, such as the existence of policies against discrimination and the posting of such policies, shield an employer from punitive damage claims. *See Fuller v. Caterpillar, Inc.*, 124 F. Supp. 2d 610, 618 (N.D. Ill. 2000) (*Fuller*).

The undisputed facts demonstrate that Walgreen had a policy forbidding discrimination of customers based on race. The discrimination policy was also posted in the Park Forest store. The policy was in effect at the time of the alleged discrimination. Walgreen also provided training to store employees concerning its policy against discrimination both to other employees and to customers. Contrary to Plaintiff's argument, Walgreen need not produce evidence that it trained employees specifically in regard to Sections 1981 and 1982. Instead, Walgreen needs to demonstrate a good faith effort to comply with the discriminations laws. *See Kolstad*, 527 at 545; *Fuller*, 124 F. Supp. 2d at 618. Plaintiff has failed to establish a genuine issue of material fact as to Walgreen's good faith effort to comply with the discrimination laws.

Based on the above, the Defendants' Motion for Summary Judgment as to Plaintiff's claim for punitive damages against Walgreen is granted.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part. The Motion for Summary Judgment is granted as to Plaintiff's claims against Bohney as an individual defendant and as to Walgreen for Plaintiff's claim for punitive damages. The Motion for Summary Judgment is denied as to all other claims.

Dated: 7-28-04

JOHN W. DARRAH
United States District Judge